Filed 8/4/22  P. v. Lara CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>YESENIA LARA,<br><br>    Defendant and Appellant. | F080789<br><br>(Super. Ct. No. BF173405A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Gillian Black, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Yesenia Lara was arrested in August 2018 following an allegedly gang-related group assault she committed with two juveniles, one of whom stabbed the victim. Defendant was subsequently acquitted by the jury of robbery (Pen. Code, § 212.5, subd. (c); count 2),[1] but convicted of attempted murder (§§ 664/187, subd. (a); count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 3), battery with serious bodily injury (§ 243, subd. (d); count 4), and making a criminal threat (§ 422, subd. (a); count 5). The jury found the gang enhancements attached to counts 1, 3, and 4 true, and the enhancement for personal infliction of great bodily injury (GBI) attached to count 3 true. (§§ 186.22, subd. (b)(1), 12022.7, subd. (a).)

At the sentencing hearing, the trial court granted defendant's motion for a new trial on the attempted murder count, pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess.) and this court's then-recent decision in *Medrano*.[2] On count 3, assault with a deadly weapon, the court sentenced defendant to the lower term of two years, with additional consecutive terms of three years for the GBI enhancement and 10 years for the gang enhancement, for a total determinate term of 15 years. The court imposed the middle term of two years on count 4, battery, and the lower term of 16 months on count 5, making a criminal threat, both stayed under section 654.[3]

On appeal, defendant claims her conviction for making a criminal threat, which was based on aiding and abetting principles, is not supported by substantial evidence.

---

**1**  All further statutory references are to the Penal Code.

**2**  *People v. Medrano* (2019) 42 Cal.App.5th 1001, review granted March 11, 2020, S259948 and transferred January 26, 2022, with instructions to vacate the opinion and reconsider the matter in light of Senate Bill No. 775 (2021–2022 Reg. Sess.), and rendering the opinion either depublished or not citable.

**3**  On remand for resentencing, as discussed *post*, "[t]o effectuate section 654, the trial court must impose a full term and stay execution of that term." (*People v. Relkin* (2016) 6 Cal.App.5th 1188, 1198, citing *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469–1172.)

She also claims the trial court erred in instructing the jury on group assault with respect to the GBI enhancement and the jury's finding that she personally inflicted GBI is not supported by substantial evidence. Via supplemental briefing, defendant seeks relief from the gang enhancement findings under Assembly Bill No. 333,[4] which amended section 186.22, effective January 1, 2022. She also seeks remand for resentencing in light of Senate Bill No. 81 and Assembly Bill No. 518, which amended sections 1385 and 654.[5]

The People dispute defendant's entitlement to any relief from her conviction for making a criminal threat or from the GBI enhancement. They concede that Assembly Bill 333's amendment of section 186.22 applies retroactively and that some of the gang evidence introduced does not satisfy section 186.22 as amended, but they contend the error was harmless. They also concede that remand for resentencing under Assembly Bill 518 is appropriate and, upon resentencing, Senate Bill 81 will apply.

We conclude the evidence is insufficient to support the jury's finding that defendant aided and abetted the criminal threat made by one of the juveniles just prior to his stabbing of the victim, either directly or under a natural and probable consequences theory. The evidence is also insufficient to support the jury's finding that defendant personally inflicted GBI on the victim. Finally, we conclude that defendant is entitled to relief from the gang enhancement findings under Assembly Bill 333, because the errors at issue cannot be deemed harmless. However, the prosecution has discretion to retry the gang enhancements on remand. At resentencing, section 1385 and section 654 as

---

[4] Assembly Bill No. 333 (2021–2022 Reg. Sess.) Statutes 2021, chapter 699, sections 3 and 4, pages 4–11 (Assembly Bill 333).

[5] Effective January 1, 2022, section 1385 was amended by Senate Bill No. 81 (2021–2022 Reg. Sess.) Statutes 2021, chapter 721, section 1, pages 1–3 (Senate Bill 81), and section 654 was amended by Assembly Bill No. 518 (2021–2022 Reg. Sess.) Statutes 2021, chapter 441, section 1 (Assembly Bill 518). Section 1385 was amended again, effective June 30, 2022, to effect technical changes. (Assem. Bill No. 200 (2021–2022 Reg. Sess.) Stats. 2022, ch. 58, § 15, pp. 35–37.)

amended by Senate Bill 81 and Assembly Bill 518 will apply. (*People v. Sek* (2022) 74 Cal.App.5th 657, 673–674.) Accordingly, we reverse defendant's conviction on count 5 for making a criminal threat and the GBI enhancement attached to count 3, we vacate the gang enhancement findings attached to counts 3 and 4, and we remand the matter for further proceedings. Except as modified, the judgment is affirmed.

## FACTUAL SUMMARY

### I.    Prosecution Case

#### A.    Attack on Johnny G.

Victim Johnny G., who was in his mid-20's, was not involved with gangs, but he knew of the Okie Bakers gang and he lived in Okie Bakers territory, as did defendant and her 17-year-old cousin, Pablo R.[6] Johnny was familiar with Pablo and Alex S., also 17 years old, from seeing them around, and, on occasion, he played music or smoked with them. At trial, Johnny denied he knew whether Pablo and Alex were with the Okie Bakers, but when Deputy Lomas interviewed him after he was stabbed and asked if the two "banged" with anyone, Johnny said, "the Okie."

Johnny was smoking a cigarette at a strip mall down the street from his house when Pablo and Alex approached him from behind on the sidewalk in front of the dollar store.[7] As Johnny walked down the sidewalk toward Cannon Avenue, Pablo and Alex walked right behind him. Alex then moved up beside Johnny while Pablo remained a

---

[6]    Johnny was a reluctant witness, and he testified he was taking medication for anxiety and mental illness. He referred to hearing voices several times during his testimony. He also admitted to having one felony conviction, which the parties stipulated affected his credibility.

[7]    Most of the events were videorecorded by surveillance cameras, and the parties stipulated defendant was in the three videos shown to the jury. None of the videos included audio. The first video was comprised of three clips from different cameras at the strip mall and showed Johnny, Pablo, Alex, and defendant walking. The second video showed the first part of the assault, when Alex threatened Johnny and stabbed him as he was crossing from the strip mall property to the sidewalk on Cannon Avenue. The third video showed the second part of the assault, which occurred after Johnny was chased down Cannon by Pablo and Alex, knocked to the ground next to some garbage cans, and hit and kicked by Pablo, Alex, and defendant.

4.

step behind. Defendant, who had been walking with Pablo and Alex, split off from them and followed along at distance, walking through the middle of the strip mall parking lot. Johnny made a gesture while they walked and appeared to be talking. He testified, "I guess someone told me to leave and I didn't listen, so I just stayed there and that's when it all happened." "They kind of just were talking to me, then I do not know they just did that."

The second video shows Johnny, Pablo, and Alex leaving the strip mall property and crossing onto the sidewalk on Cannon. Pablo was off to Johnny's left by a number of feet while Alex was next to Johnny's right side. With his right hand, Alex took two swings to the left, stabbing Johnny with a knife. Johnny denied anyone called him a child molester before he was stabbed, but conceded "it was over that type of stuff, but over being paranoid and that's all." However, shortly after the crime, Johnny told Deputy Newton that Alex said, "fuck you, child molester," and then stabbed him. After Alex struck him with the knife, Johnny ran down the street with Pablo just behind him and Alex further back. Defendant walked into view on the video approximately eight seconds later.

The third video, taken down the street from the strip mall and right across the street from the garbage cans where Johnny fell, shows him running with Pablo right on his heels and Alex trailing behind. The three ran out of camera view and then defendant entered camera view walking down Cannon in the direction of the group. Johnny reappeared on camera, running backwards toward the strip mall. Defendant ran toward Johnny, kicked at his back, and fell down. Johnny ran several feet and then stumbled to the ground next to the garbage cans. Pablo and Alex appear to be hitting and kicking Johnny as he sat on the ground. Defendant ran over, kicked Johnny a number of times, and then walked off in the direction of the strip mall. Pablo and Alex continued to kick and hit Johnny. After Johnny handed Alex his wallet, Pablo and Alex also walked off in the direction of the strip mall. Johnny stood up and walked down Cannon away from the

strip mall. There was no blood visible on the surveillance footage, including on Johnny's shirt, but deputies located drops of blood on the ground in the area where Johnny was stabbed, on the ground by the trash cans where he was knocked to the ground, and on the side of one of the trash cans.

When Johnny made it home, someone called 911. Deputy Newton arrived and found Johnny sitting slumped over on a couch with his hands on his stomach. He had an abdominal laceration four to six inches long, and he was cradling three to four inches of intestine protruding from the wound. He also had two lacerations in the area of his right elbow, a cut under his left eye, and other various cuts and scratches on his face. He was transported to the hospital by ambulance, but there was no other evidence presented regarding the extent of his injuries or the treatment he received.

### B. Gang Evidence

#### 1. General Background

Lomas, the prosecution's gang expert, explained that gangs in Kern County are generally segregated by race, although there are exceptions. The Bakersfield Police Department patrols areas that include mostly Black gang territory while the Kern County Sheriff's Department patrols areas that include mostly Hispanic gang territory, with White gang territory around the Oildale area in Kern County. In California, Hispanic gangs are divided between the Norteños, a northern gang aligned with the Nuestra Familia prison gang, and the Sureños, a southern gang aligned with the Mexican Mafia prison gang, with the geographical dividing line in Delano, approximately. On the streets, Norteño and Sureño gangs break down further into cliques or subsets based on geographical area or streets, and the subsets have their own rivalries even though they are aligned under the same northern or southern gang umbrella. In custody, however, there are no neighborhood subsets and gang members are either northerners or southerners.

In the streets, gangs have their traditional boundaries, but they constantly fight over territory in an attempt to expand boundaries, which benefits the gang by allowing

6.

for increased activity and greater safety. In Kern County, there are a few top spots, filled by "shot callers" who "'hold the keys to the county,'" or run things for the Sureños. If someone holding the keys tells a juvenile up-and-coming gang member to do something, that individual has to carry out the order or face exclusion from the gang and possible assault. Lomas stated that the shot caller in Kern County had recently died, leaving no one with the keys, which resulted in an increase in assaults as gang members tried to make names for themselves.

Lomas also explained the concept of taxation within the Sureño gang. At the street level, a predetermined portion, or tax, of money made from crimes, including drug sales, robberies, and burglaries, must be paid monthly, in varying amounts such as $100, $200, or $500. Those taxes are generally collected by someone on the streets who is further up in the hierarchy. The money then makes its way up the hierarchy to gang members in custody, generally through women or others without criminal records, who deposit the money into the gang members' in-custody accounts. Lomas testified that "'[h]ot money'" refers to money that is made but not taxed, or skimmed, and if the gang discovers that someone is skimming, there are repercussions, including assault.

Lomas opined that as a result of taxation, any crime that generates revenue benefits the gang. He also testified that gang members usually commit crimes with other gang members, which allows them to split up afterward and better evade law enforcement. It also creates a built-in incentive not to talk, so as to avoid being labeled a snitch around the neighborhood. Within the community, crime benefits the gang by instilling fear, which earns the gang respect and keeps community members quiet. It also results in some businesses within a gang's territory paying taxes to that gang for security against robberies committed by other gangs.

### 2. Okie Bakers

The Okie Bakers is a Sureño street gang in Kern County that, for some members, breaks down further into the Okie Bakers Malditos, Okie Bakers Cyclones, and Okie

7.

Bakers Southeast subsets, all of which get along. The Okie Bakers was formed in the 1970's, and common abbreviations include OB, OBK, OBM (Malditos), OBC (Cyclones), and OBSE (Southeast). Further signs or symbols claimed by the gang include the number 13 for M, which is the 13th letter of the alphabet and signifies Mexican Mafia; X3 or three dots on top of two lines signifying the number 13; KC for Kern County; 661, which is the current area code and also stands for 6+6+1=13; 805, which is the former area code; the Kansas City Royals (KC); and the Baltimore Orioles (O).[8]

### 3. Primary Activities and Predicate Offenses

Lomas testified that primary activities of the Okie Bakers include illegal possession of firearms and ammunition, sale of narcotics, burglary, assault, murder, and robbery, with group robbery being a key activity. He also testified to six offenses the prosecutor intended to rely on to satisfy the predicate offenses element under the gang statute.[9]

---

[8] The prosecution relied on a PowerPoint presentation to introduce, in relevant part, multiple photos depicting Okie Bakers-related hand signs, clothing, graffiti, and participants. The parties do not raise a dispute regarding either the existence of the Okie Bakers as "an ongoing, organized association or group of three or more persons … having a common name or common identifying sign or symbol," or the involvement of defendant, Pablo, and Alex in the gang. (§ 186.22, subd. (f).) Therefore, we do not further summarize the photographic evidence relevant to those issues.

[9] We summarize the offenses in the order introduced by the prosecution rather than chronologically. The relevant date for a predicate offense is the date the offense was committed. (§ 186.22, subd. (e)(1) [former subd. (e)].) For the purpose of resolving defendant's challenge to the predicate offenses, addressed in part II. of the Discussion, we rely on the dates of arrest from the certified records, as it appears the involved parties were arrested at the time of or shortly after the offenses were committed, and the commission dates are not clear from the record. With respect to the second predicate offense, the prosecutor referred to an incident date of May 27, 2018, but the relevant record reflects that Jesse Diaz was arrested for that predicate offense on May 25, 2017. Regarding the sixth predicate offense, prior to jury instructions and closing arguments, the trial court noted that Gustavo Vasquez's conviction under former section 12020, subdivision (a)(4), possessing a concealed dirk, did not qualify as a predicate offense under the gang statute.

The first predicate offense was committed by Andrew Chavez, whom Lomas testified was an active Okie Bakers member at the time. Chavez was arrested on June 9, 2017, and convicted by plea of possession of a firearm by a felon. (§ 29800, subd. (a)(1).)

The second predicate offense was committed by Jesse Diaz, an active Okie Bakers member according to Lomas. Diaz was arrested on May 25, 2017, and convicted by plea of assault with force likely to produce GBI. (§ 245, subd. (a)(4).)

The third and fourth predicate offenses were based on the same incident. Lomas testified that A.S., a juvenile who hung out with the Okie Bakers, was caught with a stolen vehicle and then labeled a snitch on the streets for saying more than she should have. After leaving a store in Okie Bakers territory located in the same area as the strip mall in this case, A.S. heard footsteps behind her. She turned, was slapped in the face by Alex, and fell to the ground, where she was assaulted by Alex, Pablo, and Destiny Ramos, who was an active Okie Bakers member aligned with the Malditos subset and known as "Lil Chewy." Justin Cerda, known as "Lil Toker" and photographed flashing a gang hand sign "claiming" the Okie Bakers Malditos, was also present. Cerda coached and cheered on Alex during the assault, and Ramos took A.S.'s clothing and items from her pockets during the assault. Ramos was arrested on February 7, 2018, and convicted by plea of robbery. (§ 212.5, subd. (c).) Cerda was arrested on February 8, 2018, and convicted by plea of assault by means of force likely to cause GBI. (§ 245, subd. (a)(4).)

The fifth predicate offense also involved Destiny Ramos. She was arrested on June 25, 2019, for slashing a street vendor in the face and taking money from his pockets. She was convicted by plea of robbery. (§ 212.5, subd. (c).)

The sixth offense discussed by Lomas was committed by Pablo's brother, Gustavo Vasquez, who was an active Okie Bakers member known as "Lazy Boy." Vasquez was arrested on February 21, 2008, after officers found a fixed-blade knife on him during a

probation or parole search.  Vasquez was convicted by plea of possessing a concealed weapon (dirk).  (Former § 12020, subd. (a)(4).)

### 4. Evidence Crimes Gang Related

For the purpose of proving the charged crimes were "committed for the benefit of, at the direction of, or in association with" the Okie Bakers, Lomas opined that defendant, Pablo, and Alex were active Okie Bakers members in August 2018.[10]  Defendant's moniker or nickname was "Nana," Pablo's was "Lil Lazy," and Alex's was "Lil Aces." Lomas testified that their status in the gang was evidenced by graffiti that read "'free Lil Lazy,'" "Nana" and "Aces," a reference to their in-custody status.  Lomas explained that, regardless of who spray painted the message, the fact that the three were named on a wall in Okie Bakers territory evidenced they were respected and in good standing with the gang.  If they did not have such standing with the gang, their names would not be tagged on the wall, and, if tagged, would be crossed out.

Lomas testified that within Sureño gang culture, there is a rule requiring a gang member to assault a known or suspected sex offender if they cross paths, and the failure to do so will result in repercussions against the member, including assault.  He opined that the surveillance camera footage showed defendant veering away from Pablo and Alex into the strip mall parking lot so she could block Johnny if he tried to run and act as a lookout, and Lomas noted that as defendant walked, she kept watching Pablo, Alex, and Johnny.  Lomas stated that it was a common tactic in the streets and in custody for a gang member to hang back from the group to block the escape route, act as a lookout, and step in if the other participants failed to complete the crime.

---

**10**  Defendant does not challenge the sufficiency of the evidence on this issue and we need not summarize all of the evidence relied on to support Lomas's opinion.  It suffices to note that the prosecution adduced evidence linking defendant, Pablo, and Alex to the Okie Bakers and to other gang members, including Vasquez and Ramos.  The evidence also included a jail call between defendant and a woman believed to be Ramos after defendant's arrest, in which the crimes were alluded to.

The prosecutor asked Lomas to assume the following hypothetical facts: three Okie Bakers members encounter someone suspected of being a sex offender in Okie Bakers territory; the two male members walk with the victim while the female member walks away by 20 to 30 feet; one of the male members says, "'fuck you, you child molester,'" and stabs the victim; the victim runs away with the two male members in pursuit; the female member follows along and then kicks the victim when he manages to put some distance between himself and the male members; all three members beat and kick the victim; after the female member walks away, the two males rob the victim; and the victim is left with lacerations and a cut allowing the "injuries [to] protrude." Lomas opined that the crimes described were committed for the benefit of, at the direction of, and in association with the Okie Bakers.

Lomas stated that the hypothetical crimes show the Okie Bakers are not afraid to commit crimes in public in broad daylight, and showing lack of fear benefits the gang. He also stated that the robbery benefits the gang by generating funds to pay taxes with, assuming there is money in the wallet. With respect to association, Lomas stated that gang associates or hangers-on must "put in the work" to gain status and become members, and that when gang members commit crimes together, they are doing it in association with their gang. Finally, in accordance with the rule that a suspected sex offender must be assaulted on sight, the statement, "'fuck you, child molester,'" preceding the stabbing demonstrates the crime was committed at the direction of the Okie Bakers.

## II.     Defense Case

Defendant's 12-year-old niece and Johnny testified briefly. Defendant's niece identified herself as the person seen in the first video riding a bike through the strip mall parking lot, and she confirmed that defendant's family nickname was "Nana." Johnny stated he did not know the names of the two juveniles involved and did not recall what they were wearing. Regarding the end of the altercation when he was on the ground by

11.

the garbage cans, he said the two juveniles were not talking to him, but based on their actions, they wanted him dead. When asked whether the juvenile who did not stab him said, "'don't make us kill you,'" Johnny responded, "Yeah. Yeah, they said that."

Defendant also testified. She was 22 years old at the time of the crimes, and she lived in the area where they occurred. Pablo and Vasquez were her cousins, she knew Ramos well, and she knew of Cerda. Defendant acknowledged that Vasquez and Ramos were Okie Bakers, she lived in Okie Bakers territory and associated with the Okie Bakers, and the crimes occurred in Okie Bakers territory. However, she denied joining the gang and said she did not know if Pablo and Alex were members. She confirmed her moniker was "Nana," Pablo's was "Lil Lazy," Vasquez's was "Lazy Boy," Ramos's was "Lil Chewy," and Cerda's was "Lil Toker." She said she did not know Alex, but she had seen him with Pablo and his moniker was "Aces." Defendant had multiple tattoos, but all were of family members' names, with the exception of one tattoo that read "'fuck it.'"

Defendant testified she was tired that day, as she was coming down from PCP and had used methamphetamine. However, she later testified during cross-examination that the drugs did not affect her memory or perception of the events in question. Defendant admitted she kicked Johnny in the back and kicked him while he was on the ground, unprovoked, and she acknowledged he might have escaped from Pablo and Alex if she had not kicked him. She said she was angry because he was fighting with Pablo, although she admitted he was just defending himself. Defendant denied knowing who Johnny was, denied any knowledge he was a suspected sex offender, denied planning in advance to assault or rob him, and denied hearing any threats or making any threats. She also denied knowing Alex had a knife or that he stabbed Johnny, and she denied seeing any blood on Johnny's shirt.

Defendant told the jury she was walking from her house to a taco stand by the strip mall when she ran into Pablo and Alex as they exited an alleyway. They went with her to the taco stand but it was not yet set up and she decided to go back home, so they parted

12.

ways.  As she started walking home, she saw a man—Johnny—in a green shirt exit the dollar store, but she was not familiar with him and did not notice anything suspicious about the situation.  Defendant was walking behind Pablo, Alex, and Johnny when she walked off toward a van that almost backed into her niece, who was riding a bicycle through the parking lot.  She just kept walking in the same direction after the van drove off, and she looked back at one point because the door of a marijuana dispensary opened.  She denied seeing anything suspicious and denied she was acting as a lookout.  She took a few steps back as she neared Cannon, because she was thinking about asking the taco stand how much longer before they were set up.

Defendant said she saw Alex strike Johnny, but her movement on the video was unrelated and she did not see Johnny coming back in her direction.  She watched Johnny run down the street with Pablo right behind him.  At one point, she picked up her pace and then slowed down again because she had a dry mouth and was losing her breath.  Out of view of the cameras, Pablo and Johnny were punching each other, and she joined in the altercation because she saw Pablo was getting into a fight.  She intended to hit Johnny, but ended up kicking him.  After she, Pablo, and Alex kicked Johnny while he was on the ground, she thought it was over and walked away.  She did not see Pablo and Alex take anything from Johnny.

Defendant said she did not notice that the assault by the garbage cans was being watched by someone standing in a front yard, but she saw the black truck that was present and neither cared nor worried that the people inside could see what was happening.  She was also unbothered over participating in the assault.  After the incident ended, she and Pablo walked back to the taco stand, which was still not open, and then back to her house to get some water before heading to the park.  As she and Pablo walked toward the park, she saw law enforcement officers.  She was then taken into custody, where she remained.

13.

## III. Rebuttal

In rebuttal, Deputy Carrillo testified that he arrested defendant, transported her to the receiving facility, and interviewed her there. Her booking photo was admitted into evidence and Carrillo stated there was no indication she was under the influence of drugs. He did not recall the timing of these events, but he was dispatched to the scene at 6:30 p.m.

## DISCUSSION

## I. Substantial Evidence Claims

### A. Criminal Threat

#### 1. Background

With the exception of the battery charge, the prosecutor relied on theories of direct aiding and abetting and the natural and probable consequences doctrine to establish defendant's liability in this case.[11] During the jury instruction conference, the trial court expressed the view that for purposes of the natural and probable consequences doctrine, assault and battery were the target offenses, and robbery and attempted murder were nontarget offenses. The criminal threat charge, however, did not fit within that theory and was based on direct aiding and abetting. The prosecutor agreed and the trial court instructed the jury accordingly.

During closing argument, the prosecutor argued that defendant's liability for the criminal threat made by Alex was not as the perpetrator and "probably not actually" as a direct aider and abettor. Instead, he focused on natural and probable consequences, stating, "Now, the jury instruction that deals with natural and probable consequence doesn't actually specify Count 5, but in this particular instance, Count 5 would be what's called a non-target offense. That is to say it was not [defendant's] intention that

---

[11] The prosecutor argued the jury could also convict defendant of battery as a direct perpetrator, and the jury was instructed on unanimity with respect to the acts underlying the assault and battery counts.

14.

somebody should threaten [Johnny]. It is, therefore, a non-target offense. The target offense she has to be guilty of first is either the battery or the assault."

On appeal, defendant claims the evidence is not sufficient to support the jury's finding that she is criminally liable for Alex's threat, which was made at the beginning of the incident and unaccompanied by any evidence that she heard the threat, thought Johnny was a sex offender, or knew Alex thought he was. Further, the threat could not be a reasonably foreseeable consequence of either the assault or the battery, which followed. For the reasons that follow, we agree.

## 2. Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio, supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ….'" (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no

15.

hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict" (*Zamudio, supra*, at p. 357), but "speculation, supposition and suspicion are patently insufficient to support an inference of fact" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268).

### 3.      Applicable Legal Principles

"To establish a criminal threat, the prosecution must prove:  (1) the defendant willfully threatened death or [GBI] to another person; (2) the threat was made with the specific intent that it be taken as a threat, regardless of the defendant's intent to carry it out; (3) the threat was 'on its face and under the circumstances in which it [was] made, … so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution'; (4) the threat caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety'; and (5) this fear was reasonable under the circumstances. (§ 422, subd. (a); see *People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)"  (*People v. Turner* (2020 10 Cal.5th 786, 826; accord, *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 809.)

"A person who aids and abets the commission of a crime is culpable as a principal in that crime.  (§ 31.)  Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime.  [Citation.]  Our law recognizes two forms of liability for aiders and abettors.  [Citation.]  First, under direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 843.)

"Second, under the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense),

16.

but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense). [Citation.] A nontarget offense is the natural and probable consequence of a target offense 'if, judged objectively, the [nontarget] offense was reasonably foreseeable.' [Citation.] The accomplice need not actually foresee the nontarget offense. 'Rather, liability "'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'"' [Citation.] [¶] Unlike direct aiding and abetting liability, culpability under the natural and probable consequences theory does not require an accomplice to share the direct perpetrator's intent. Instead, '[a]ider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature' and '"is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense"' may not be intended at all." (*People v. Gentile, supra*, 10 Cal.5th at pp. 843–844; accord, *People v. Smith* (2014) 60 Cal.4th 603, 611.)

####     4.     Analysis

The facts in this case do not support imposition of liability for making a criminal threat, based either on direct aiding and abetting principles or on a natural and probable consequences theory. Turning first to direct aiding and abetting, a theory the prosecutor effectively disavowed during closing argument, Alex said, "'fuck you, child molester,'" and then stabbed Johnny. There was no evidence concerning the volume of Alex's voice when he made the threat, and defendant was not in camera view. She walked into view approximately eight seconds later, consistent with the prosecutor's theory that she kept her distance and acted as a lookout. These facts do not support a reasonable inference that defendant heard the threat, and there was no evidence presented that she knew who Johnny was beforehand, knew or suspected he was a sex offender, or knew that Alex thought he was and planned to assault him for that reason.

The People argue defendant's conviction may be affirmed in light of Lomas's testimony. Through Lomas, the prosecutor introduce evidence of a Sureño gang rule that suspected sex offenders must be assaulted on sight, the Okie Bakers was a Sureño gang, and defendant, Alex and Pablo were Okie Bakers members. Lomas also opined, based on the prosecutor's hypothetical question, that "the assault was committed for the benefit of, in association with, and at the direction of the Okie Bakers criminal street gang." Based on this evidence, the People contend the jury could reasonably infer Johnny was assaulted because of the group's shared belief he was a sex offender.

A gang expert, however, may not supply missing elements of the offense. "[A]n expert may render an opinion assuming the truth of facts set forth in a hypothetical question, [but] the 'hypothetical question must be rooted in facts shown by the evidence.' [Citation.] Indeed, an 'expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors."'" (*People v. Franklin, supra*, 248 Cal.App.4th at p. 949; accord, *People v. Vang* (2011) 52 Cal.4th 1038, 1045.) Here, there was no evidence from which to infer that defendant aided and abetted Alex's threat, and Lomas's mere opinion that the victim in the hypothetical was threatened in accordance with a gang rule that suspected sex offenders must be assaulted cannot support defendant's conviction.

The prosecutor also argued that defendant was criminally liable for Alex's threat because it was a natural and probable consequence of the target offenses of assault and battery, notwithstanding the earlier discussion with the trial court on the absence of support for that theory of liability as to count 5. The People do not argue that this was a viable theory and, plainly, the threat in this case, which preceded the assault and battery, was not a natural and probable consequence—that is, a reasonably foreseeable *consequence*—of a subsequently committed assault or battery. (*People v. Gentile, supra*, 10 Cal.5th at pp. 843–844; *People v. Smith, supra*, 60 Cal.4th at p. 611.)

Defendant's conviction on count 5 for making a criminal threat is not supported by substantial evidence that she aided and abetted Alex's threat, and, therefore, she is entitled to reversal of the conviction. Retrial is barred by the double jeopardy clause. (E.g., *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 ["[T]he defendant may not be retried if the judgment is reversed because, as a matter of law, the evidence was insufficient to support a conviction."].)

### B. GBI Enhancement

Next, defendant challenges the jury's finding that she personally inflicted GBI on Johnny. She claims the trial court erred in instructing the jury on a group assault theory and the enhancement finding is not supported by substantial evidence.[12] The People disagree on both points. For the reasons that follow, we conclude that the enhancement for personal infliction of GBI is not supported by substantial evidence, which moots defendant's separate claim of instructional error.

The jury convicted defendant of assault with a deadly weapon and found the GBI enhancement allegation under section 12022.7, subdivision (a), true. That statute provides, "Any person who *personally inflicts* [GBI] on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (Italics added.)

However, defendant's liability for Alex's assault on Johnny with the knife was premised on aiding and abetting, and "a person who merely aids, abets, or directs another to inflict an injury is not subject to the enhancement penalty of section 12022.7." (*People v. Ollo* (2021) 11 Cal.5th 682, 692 (*Ollo*); accord, *People v. Cole* (1982) 31 Cal.3d 568, 571.) "'Proximately causing and personally inflicting harm are two different things'" (*Ollo, supra*, at p. 693, quoting *People v. Bland* (2002) 28 Cal.4th 313, 336), and "'[t]o

---

[12]     The trial court instructed the jury on group assault pursuant to CALCRIM No. 3160.

"personally inflict" injury, the actor must do more than take some direct action which proximately causes injury'" (*Ollo, supra*, at p. 692, quoting *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 349). "[I]n the context of an assault conviction, personal infliction 'calls for the defendant to administer a blow or other force to the victim' and 'for the defendant to do so directly rather than through an intermediary.'" (*Ollo, supra*, at p. 688, quoting *People v. Modiri* (2006) 39 Cal.4th 481, 493 (*Modiri*) [interpreting personal infliction of GBI under § 1192.7, subd. (c)(8)].) "'[T]he defendant's role in both the physical attack and the infliction of [GBI] cannot be minor, trivial, or insubstantial.'" (*Ollo, supra*, at p. 688, quoting *Modiri, supra*, at p. 494.) "Such determinations regarding a defendant's role in the physical attack and resulting injury cannot be made from a defendant's assault conviction alone. Instead, the factfinder must examine the circumstances underlying the conviction." (*Ollo, supra*, at p. 688.)

The parties do not dispute the foregoing and the prosecutor did not argue otherwise at trial. Rather, the prosecutor relied on the exception for a group assault, arguing, "Now I'm not suggesting that her foot could have stabbed [Johnny], but I am suggesting that when somebody has a stab wound and you start stomping on them, the fact that their insides may come out of their body is significantly more likely and that's part of the injury that she used enough force to assist to contribute to that injury, that's the group assault theory. And there's really no question that it is true."

In *Modiri*, the California Supreme Court recognized two group beating theories that provided a basis for imposing liability for personal infliction of GBI. In some cases, "the force personally used by the defendant during a group attack was serious enough that it may, *by itself*, have caused [GBI], even though the evidence did not show for certain that the defendant's acts alone perpetrated specific harm or that nobody else injured the victim." (*Modiri, supra*, 39 Cal.4th at p. 496.) In other cases, "a personal-infliction finding [was permitted] where the physical force the defendant and other persons applied to the victim at the same time *combined* to cause great bodily harm." (*Ibid.*) In

20.

approving the theories as sound, the court reasoned a "contrary view would mean that '[o]nly those whose foot could be traced to a particular kick, whose fist could be patterned to a certain blow or whose weapon could be aligned with a visible injury would be punished. The more severe the beating, the more difficult would be the tracing of culpability.' [Citation.] Under such circumstances, all participants in a group attack who personally caused or contributed to the infliction of harm could conceivably escape enhanced punishment." (*Id.* at p. 497.)

The deficiency in this case is the absence of any evidence that Johnny's disembowelment was separable from the stab wound and the result of the group kicking. The prosecutor made the argument, but the evidence showed only that Johnny had a four-to-six inch stab wound in his abdomen and Deputy Newton observed three to four inches of intestine protruding from that wound. Johnny was stabbed by Alex at the beginning of the incident, as Johnny walked from the strip mall to the sidewalk on Cannon. After being stabbed, Johnny fled down Cannon with Alex and Pablo chasing him. He subsequently ran the other direction, at which point defendant kicked him in the back, and, once he was on the ground, the group hit and kicked him. There was no photographic evidence of the wound, no medical testimony, and no description of the wound other than that by Johnny and Newton.

The People argue defendant's position "would have merit [only] if the evidence conclusively established that" the disembowelment occurred before she kicked him on the ground, and she "should not be able to exploit the uncertainty of causation to avoid" the enhancement. However, the Legislature did not intend the statute to apply broadly, and the prosecution bears the burden of proving that defendant was a principal who directly inflicted the injury. (*Ollo, supra*, 11 Cal.5th at p. 689.) "'[A]n absence of evidence is not the equivalent of substantial evidence'" (*People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 498, quoting *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 655), and while the jury is entitled to draw inferences, those

21.

inferences must be reasonable and must be based on evidence in the record; the jury's finding cannot rest on pure speculation or conjecture. It is conceivable that kicking a victim who had been stabbed *might* exacerbate a wound such that the kicker personally inflicted a "significant or substantial physical injury" (§ 12022.7, subd. (f)), but in this case, there is no evidence from which to reasonably infer that the protrusion of Johnny's intestine through the four-to-six inch stab wound previously inflicted by Alex was caused by being kicked.

In the absence of substantial evidence supporting the jury's finding that defendant personally inflicted GBI on Johnny, she is entitled to have the enhancement attached to count 3 reversed. Retrial is barred. (*People v. Eroshevich, supra*, 60 Cal.4th at p. 591.)

## II.    Assembly Bill 333

Finally, in light of Assembly Bill 333, defendant seeks to have the gang enhancement findings vacated, subject to retrial. The People concede that defendant is entitled to retroactive application of Assembly Bill 333, but contend no relief is due because the errors were harmless beyond a reasonable doubt.[13] In reply, defendant disagrees and argues, "'To rule that the existence of evidence in the record that would permit a jury to make a particular finding means that the jury need not actually be asked to make that finding would usurp the jury's role and violate [the defendant's] right to a jury trial on all the elements of the charged allegations.'" (Quoting *People v. Lopez* (2021) 73 Cal.App.5th 327, 346.) Defendant also argues that in contrast with instructional errors omitting uncontested elements and upheld as harmless beyond a reasonable doubt, the changes to section 186.22 under Assembly Bill 333 were not at issue during trial and cannot be characterized as uncontested.

---

[13]    Assembly Bill 333 also added section 1109 to the Penal Code, which addresses the bifurcation of both substantive gang offenses and gang enhancements under section 186.22, but that amendment is not at issue in this appeal and the People's concession on retroactivity does not extend to section 1109.

22.

### A. Amendments to Section 186.22

As this court summarized in *Ramos*, "Assembly Bill 333 amended the definition of a "'criminal street gang,'" requiring proof that the gang is an *organized* association, whose members *collectively* engage in, or have engaged in, a pattern of criminal activity (§ 186.22, subd. (f)). Next, the law created a stricter requirement for proof of a 'pattern of criminal gang activity,' which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subd. (e).) Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (See former § 186.22, subd. (e).) Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, the last of the predicate offenses must have 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed.' The predicate offenses must have been committed by gang 'members,' and must have been for the 'common[] benefit[] [of] a criminal street gang.' (§ 186.22, subd. (e)(1).) Assembly Bill 333 also narrowed the list of offenses that may be used to establish a pattern of criminal gang activity (compare former § 186.22, subd. (e)(1)–(33) with § 186.22, subd. (e)(1)(A)–(Z)). Additionally, it defines 'to benefit, promote, further, or assist' throughout section 186.22 to mean 'to provide a common benefit to members of a gang where the common benefit is more than reputational.' (§ 186.22, subd. (g).) The legislation notes examples of a common benefit that are more than reputational 'may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.' (*Ibid.*)" (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1125–1126 (*Ramos*).)

23.

## B. Retroactivity

This court has concluded that Assembly Bill 333's amendment of section 186.22 is ameliorative in nature and, therefore, applies retroactively to nonfinal cases such as this one, in accordance with *In re Estrada* (1965) 63 Cal.2d 740. (*People v. Montano* (2022) 80 Cal.App.5th 82, 103–105; *Ramos, supra*, 77 Cal.App.5th at p. 1127; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822; see *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032–1033, fn. 9.) The People do not contend otherwise.

## C. Errors Not Harmless

In her brief, defendant focuses on the six predicate offenses previously summarized. (§ 186.22, subd. (e)(1).) She claims that the first, second, and fifth predicates lacked evidence that Chavez, Diaz and Ramos, respectively, acted to benefit the gang within the meaning of the amended statute; Ramos also acted alone; and the sixth predicate involving Vasquez occurred outside the permissible statutory time frame. She contends that the third and fourth predicates appear to be gang-related, but were not proven so at trial, and the incidents are duplicative. She argues these errors require reversal.

The People concede that four of the six predicate offenses no longer qualify under the gang statute as amended. They agree with defendant's position concerning the first and second predicate offenses. As to the fifth predicate offense, they contend it is unnecessary to consider the argument advanced by defendant because the offense was committed after the crimes in this case and, for that reason, does not qualify as a predicate under the statute. As to the sixth predicate, they disagree that it falls outside the statutory time frame, but contend it does not qualify under the statute as amended because there was no evidence it benefitted with gang. However, they argue that, beyond a reasonable doubt, the jury would have found the third and fourth predicate offenses satisfied the requirements of the gang statute under Assembly Bill 333, and, therefore, the errors were harmless.

24.

We agree that the first, second, fifth, and sixth predicate offenses were not supported by substantial evidence that, one, the crimes benefitted the Okie Bakers and, two, the benefit was more than reputational. (§ 186.22, subd. (e)(1).) The fifth offense also occurred after the crimes in this case, as stated by the People, which eliminates it as a predicate offense; and, although not addressed by the parties, Vasquez's conviction for concealing a dirk is not a qualifying offense under the statute. (*Id.*, subd. (e)(1)(A)–(Z).) The latter issue with Vasquez's conviction was flagged by the trial court prior to jury instructions, and the court instructed that a pattern of criminal activity meant possession of a firearm by a felon, assault, or robbery.

This leaves the third and fourth predicate offenses, which were based on the assault of A.S. in February 2018. The amended statute requires that predicate offenses be "committed on separate occasions *or* by two or more members" (§ 186.22, subd. (e)(1)

, italics added), and while there is evidence in the record that Ramos was an active Okie Bakers member, Lomas did not expressly state that Cerda was a member, as the People concede. Furthermore, the evidence that A.S.'s assault was retaliatory was limited to Lomas's testimony that "word on the street was that she was a snitch." Some of the evidence admitted at trial was objectionable on hearsay grounds (*People v. Sanchez* (2016) 63 Cal.4th 665, 686), and we presume defense counsel's election not to object was a reasonable tactical decision (*People v. Riel* (2000) 22 Cal.4th 1153, 1185).[14] However, counsel may have made a different calculus had the amended version of section 186.22 been in effect at trial and it remains that the jury was not tasked with finding the predicate offenses were gang related, an element the prosecution must now prove beyond a reasonable doubt.

---

[14] Although our disposition of defendant's claim does not rest on this ground, it bears mention that the trial in this case also occurred before the California Supreme Court's decision holding that predicate offenses are case-specific facts that must be proven by competent evidence. (*People v. Valencia* (2021) 11 Cal.5th 818, 838–839.)

To the contrary, the jury was instructed that "the crimes, if any, that establish a pattern of criminal gang activity need *not* be gang related," and "[i]f you find the defendant guilty of a crime in this case, you *may* consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved." (Italics added.) Furthermore, the jury was not instructed that in determining whether defendant's crimes were "committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" (§ 186.22, subd. (b)(1)), it had to find "a common benefit to members of a gang where the common benefit is more than reputational" (*id.*, subd. (g)).

We reject the People's argument that these errors may be deemed harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). "The People must prove all elements of an alleged sentence enhancement beyond a reasonable doubt" (*People v. Miles* (2008) 43 Cal.4th 1074, 1082), and, therefore, the error at issue is constitutional (*People v. Merritt* (2017) 2 Cal.5th 819, 824). Under *Chapman*, we ask "whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt, supra*, at p. 831; accord, *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1090; *People v. Hola* (2022) 77 Cal.App.5th 362, 376, fn. 14; see *People v. Aledamat* (2019) 8 Cal.5th 1, 9 [reasonable doubt standard applies to all errors arising from misdescriptions of the elements].) "[I]t is not enough to show that substantial or strong evidence existed to support a conviction under the correct instructions" (*People v. Sek, supra*, 74 Cal.5th at p. 668; accord, *People v. E.H.* (2022) 75 Cal.App.5th 467, 479), which is the essence of the People's argument.

"'The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.] "To say that an error did not contribute to the ensuing verdict is … to find that error unimportant in

26.

relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the … verdict actually rendered in this trial was surely unattributable to the error." [Citation.]'" (*People v. Pearson* (2013) 56 Cal.4th 393, 463; accord, *People v. E.H., supra*, 75 Cal.App.5th at pp. 479–480; *Ramos, supra*, 77 Cal.App.5th at p. 1128; *People v. Sek, supra*, 74 Cal.App.5th at p. 669.)

Viewed through the lens of the amended gang statute, multiple errors occurred. The trial evidence was deficient under the statute as amended, the jury was not instructed as to some of the findings it is now required to make, and it was affirmatively misinstructed as to other findings. These combined errors cannot be characterized as harmless beyond a reasonable doubt. Therefore, we vacate the gang enhancement findings attached to counts 3 and 4 and remand the matter to the trial court for further proceedings. At the prosecution's election, the gang enhancements may be retried. (*Ramos, supra*, 77 Cal.App.5th at p. 1128; accord, *People v. Rodriguez, supra*, 75 Cal.App.5th at p. 824; *People v. Vasquez, supra*, 74 Cal.App.5th at p. 1033.) At the juncture defendant is resentenced, section 1385 and section 654, as amended by Senate Bill 81 and Assembly Bill 518, will apply. (*People v. Sek, supra*, 74 Cal.App.5th at pp. 673–674.)

## DISPOSITION

Defendant's conviction on count 5 for making a criminal threat and the enhancement finding for personal infliction of GBI attached to count 3 are reversed for insufficient evidence. In light of Assembly Bill 333, the gang enhancement findings attached to count 3 and count 4 are vacated and the matter is remanded to the trial court. If the prosecution does not elect to retry defendant on the gang enhancements within 60 days from the filing of the remittitur in the trial court, the trial court shall resentence

defendant and forward an amended abstract of judgment to the appropriate authorities. Except as modified, the judgment is affirmed.

MEEHAN, J.

WE CONCUR:


HILL, P. J.


DETJEN, J.